IN THE

# ARIZONA COURT OF APPEALS

DIVISION TWO

---

NBD ENTERPRISES, LLC,
AN ARIZONA LIMITED LIABILITY COMPANY,
*Plaintiff/Appellee,*

*v.*

JAMES CHRISTOPHER ARNOLD AND STACEY L. ARNOLD, ARIZONA RESIDENTS;
UCI CAPITAL INC., AN ARIZONA CORPORATION;
AFG, INC., AN ARIZONA CORPORATION,
*Defendants/Appellants.*

No. 2 CA-CV 2024-0396
Filed September 30, 2025

---

Appeal from the Superior Court in Maricopa County
No. CV2024013750
The Honorable M. Scott McCoy, Judge

**AFFIRMED**

---

COUNSEL

May, Potenza, Baran & Gillespie P.C., Phoenix
By Jesse R. Callahan, Philip C. Wilson, Andrew S. Lishko, Carrie A.
Laliberte, and Kathleen A. Shaffer

and

Rai Duer PC, Phoenix
By Peter B. Swann
*Counsel for Plaintiff/Appellee*

Burch & Cracchiolo P.A., Phoenix
By Daryl Manhart, Susanne E. Ingold, Jake D. Curtis, and Ryan Anderson
*Counsel for Defendants/Appellants*

## OPINION

Judge Sklar authored the opinion of the Court, in which Vice Chief Judge Eppich and Judge O'Neil concurred.

S K L A R, Judge:

¶1        This case requires us to address how equitable principles affect a court's power to appoint a receiver under A.R.S. § 12-1241. The statute allows a court to "appoint a receiver to protect and preserve property or the rights of parties therein." Although the statute does not reference equity, Rule 66(c)(4) of the Arizona Rules of Civil Procedure does so. It provides, "If applicable, principles of equity govern all matters relating to the appointment of receivers."

¶2        We address the relationship between the statute and rule in reviewing the trial court's appointment of a receiver for ACP Investments, LLC. The appellants, including ACPI's manager, James Christopher Arnold, argue that, consistent with Rule 66(c)(4), equity generally does not allow a receiver to be appointed for an ongoing business that is solvent and capable of continuing to operate. They argue that ACPI satisfied these conditions, so the court erred by appointing a receiver.

¶3        We disagree. Under the statute, the trial court concluded that a receiver was necessary to protect ACPI and its property. And consistent with the rule, the court's decision was guided by equitable principles. It was also supported by the evidence. Plaintiff NBD Enterprises, LLC, an ACPI member, presented evidence that ACPI had overstated its loans from Arnold by tens of millions of dollars, suffered significant financial losses, and misled investors. ACPI's satisfaction of the conditions identified by Arnold did not preclude the appointment of a receiver, which we affirm.

## BACKGROUND

¶4        Arnold and NBD's principal, Taylor Lewan, organized NBD in 2014 to manage and operate Lewan's business and finances. Initially, Lewan's trust held a ninety-nine percent interest in NBD, and an entity managed by Arnold, either AFG or UCI, held the remaining one percent. Arnold was NBD's manager. Arnold was also the manager of ACPI, in which his entities hold an approximately fifty-percent interest. NBD holds a roughly twenty-percent interest.

2

¶5        In 2024, NBD applied for a receiver over ACPI.  It alleged that Arnold had misappropriated NBD's investment in ACPI and fraudulently diluted NBD's interest.  It also alleged that Arnold had used ACPI to siphon money from NBD to his entities.  And it alleged that Arnold had induced NBD to sign multiple loan documents that, in effect, increased Arnold's capital contributions to ACPI.  As a result, NBD argued that so long as Arnold remained ACPI's manager, NBD's rights in ACPI were at risk.

¶6        After an evidentiary hearing, the trial court appointed a receiver over ACPI.  Arnold appealed, along with his wife, AFG, and UCI.  We refer to the appellants collectively as "Arnold."  ACPI, which is now subject to the receivership, is not a party to the appeal.

## EQUITY'S ROLE IN A TRIAL COURT'S
## SECTION 12-1241 AUTHORITY

¶7        Because Arnold challenges the trial court's exercise of its authority under Section 12-1241, we begin by describing the scope of that authority, including the role of equity in constraining that authority.  This is an issue of law subject to de novo review.  *Gravel Res. of Ariz. v. Hills*, 217 Ariz. 33, ¶ 7 (App. 2007).

¶8        A receiver is an officer of the court that is authorized to manage a defendant's property, subject to court-imposed limits.  *See Mashni v. Foster*, 234 Ariz. 522, ¶ 15 (App. 2014); *cf.* A.R.S. § 33-2601(14)–(15) (defining "receiver" and "receivership" in real-estate context).  A receivership has been described as a "drastic remedy" that courts reluctantly impose.  *Johnson Utils, L.L.C. v. Ariz. Corp. Comm'n*, 249 Ariz. 215, ¶ 111 (2020) (Bolick, J., concurring in part and dissenting in part) (quoting *Tate v. Phila. Transp. Co.*, 190 A.2d 316, 321 (Pa. 1963)).

¶9        A receivership is also "an equitable remedy," rooted in the common law.  *UMB Bank, NA v. Parkview Sch., Inc.*, 254 Ariz. 383, ¶ 16 (App. 2023); *see also Mosher v. Lount*, 29 Ariz. 267, 273 (1925) (applying common law in reviewing court's decision to appoint receiver).  Rule 66(c)(4) comports with this understanding by providing, "If applicable, principles of equity govern all matters relating to the appointment of receivers, their powers, duties and liabilities, and the court's power."

¶10        As noted, though, the statutory basis for the receivership was Section 12-1241, which allows courts to appoint a receiver "to protect and preserve property or the rights of parties therein."  By its text, this statute does not limit the court's authority based on equitable principles.  *See*

*Garibay v. Johnson*, 259 Ariz. 248, ¶ 23 (2025) (requiring statutory interpretation to "begin with the text").

¶11 Arnold argues, though, that Rule 66's reference to equity nevertheless constrains the court's authority. He reasons that the appointment of a receiver is a procedural matter governed by our supreme court's rulemaking power. *See* Ariz. Const. art. 6, § 5 (vesting supreme court with "[p]ower to make rules relative to all procedural matters in any court"). Under that power, "in the event of irreconcilable conflict between a procedural statute and a rule, the rule prevails." *Seisinger v. Siebel*, 220 Ariz. 85, ¶ 8 (2009).

¶12 If possible, however, we must interpret the rule and statute to avoid a conflict. *See State v. Brearcliffe*, 254 Ariz. 579, ¶ 22 (2023). Doing so is possible here. Rule 66(c)(4) limits equitable principles to situations where "applicable." And as our supreme court recently reaffirmed, "When rights are clearly established and defined by a statute, equity has no power to change or upset such rights." *Aroca v. Tang Inv. Co. LLC*, 259 Ariz. 302, ¶ 21 (2025) (quoting *Valley Drive-In Theatre Corp. v. Superior Court*, 79 Ariz. 396, 399 (1955)); *see also* A.R.S. § 1-201 (adopting common law "only so far as it is . . . not repugnant to or inconsistent with . . . the constitution or laws of this state"). By using the language "[i]f applicable," Rule 66(c)(4) acknowledges this limiting principle. Thus, the equitable principles recognized in Rule 66(c)(4) do not constrain the trial court's authority to appoint a receiver under Section 12-1241.

¶13 Rule 66(c)(4) still makes equitable principles relevant in aspects of receiverships where the legislature has not spoken. These include, as applicable, the receiver's "powers, duties and liabilities, and the court's power." We also interpret Rule 66(c)(4) as directing courts to consider equitable principles in exercising their authority under Section 12-1241. This makes sense, as that authority is discretionary. *See Gravel Res. of Ariz.*, 217 Ariz. 33, ¶ 6. This interpretation gives meaning to the rule's incorporation of equity into the "appointment of receivers," while not infringing on the legislature's power to define the court's authority. *See Magee v. Olson*, No. 1 CA-SA 25-0103, ¶ 9, 2025 WL 1936508 (Ariz. App. July 15, 2025) (requiring courts to give meaning to each word in interpreting rules). In short, Rule 66(c)(4) does not constrain the court's statutory authority, but it requires that equity guide the court's exercise of its discretion.

**EXERCISE OF TRIAL COURT'S EQUITABLE DISCRETION**

**¶14**        Arnold argues that the trial court abused its equitable discretion under Section 12-1241. *Gravel Res. of Ariz.*, 217 Ariz. 33, ¶ 6. In reviewing this issue, we defer to the court's weighing of conflicting evidence and witness credibility. *Swain v. Bixby Vill. Golf Course Inc*, 247 Ariz. 405, ¶ 32 (App. 2019). We also defer to its factual findings unless they are clearly erroneous. *Flying Diamond Airpark, LLC v. Meienberg*, 215 Ariz. 44, ¶ 9 (App. 2007).

## I.   Equitable limitations guiding trial court's exercise of discretion

**¶15**        In arguing that the trial court abused its discretion, Arnold relies on the equitable principle that receiverships are a "drastic remedy" and should typically be imposed only as a "last resort." Relying on a long list of Arizona cases, Arnold distills the principle that equity counsels against appointing a receiver for a "solvent, ongoing business that is capable of continuing to operate," such as ACPI. Rather, in his view, equity typically justifies appointing a receiver where an entity is (1) insolvent or defunct, (2) facing foreclosures or plummeting secured-property values, or (3) unable to continue operating. ACPI faced none of these circumstances.

**¶16**        Much of that case law, however, derives from an earlier statute that enabled trial courts to appoint receivers in fewer circumstances than Section 12-1241. Courts could do so only in pending actions "when no other adequate remedy is given by law for the protection and preservation of property, or the rights of parties therein pending litigation" regarding those rights. Ariz. Civ. Code, § 323 (1901). And even with these limitations, our supreme court interpreted the statute to allow receiverships in more circumstances than Arnold asserts. *See generally Mosher*, 29 Ariz. 267; *United Sanders Stores, Inc. v. Messick*, 39 Ariz. 323 (1931). These included when property was "in great danger of being dissipated or destroyed." *Mosher*, 29 Ariz. at 273.

**¶17**        When the property is a business entity, that danger could occur due to mismanagement, including the likelihood that a manager will completely dissipate the company's assets. *Id.* at 273-74; *cf. State v. Alianza Hispano-Americana*, 60 Ariz. 1, 7-8 (1942) (affirming denial of state's receivership request over previously mismanaged corporation where new management could restore the corporation to solvency). It could also occur when it appears that a company is "organized and operated" on the basis of fraud. *Messick*, 39 Ariz. at 329-30. Thus, ample case law supports the

view that even under the earlier statute, the equitable limitations asserted by Arnold did not exist.

¶18 Those cases are even less relevant in light of the legislature's 1993 amendment of the statute to its current form. *See* 1993 Ariz. Sess. Laws, ch. 43, § 1; *Gravel Res. of Ariz.*, 217 Ariz. 33, ¶¶ 10-11. With that amendment, the legislature removed the requirements that a receivership be coupled with a pending action and that "no other adequate remedy" exist. 1993 Ariz. Sess. Laws, ch. 43, § 1. Now, a party may seek appointment of a receiver "even if the action includes no other claim for relief" and regardless of whether the property or these rights face irreparable harm without a receiver. *See* 1993 Ariz. Sess. Laws, ch. 43, § 1; *Gravel Res. of Ariz.*, 217 Ariz. 33, ¶¶ 10-11. That statutory change expanded courts' powers to appoint receivers beyond those recognized in the earlier cases.

¶19 Arnold does cite some post-1993 cases. But only one of them, *Gravel Resources of Arizona v. Hills*, concerns the court's authority to appoint a receiver under Section 12-1241. 217 Ariz. 33, ¶¶ 10-14. In that 2007 case, this court affirmed the appointment of a receiver over a deadlocked partnership. *Id.* The partners' "opposing interests were unmanageable," and the receiver was needed to wind down the company's affairs. *Id.* ¶ 13. Although *Gravel Resources* is distinguishable, nothing about its reasoning suggests that a court would abuse its discretion simply by appointing a receiver for solvent, operating businesses.

## II. Relevance of *Patel v. Patel* factors

¶20 We turn next to the trial court's analysis here. In exercising its equitable discretion, the court looked to seven factors that another superior-court division had identified in *Patel v. Patel*, No. CV 2017-005472, 2017 WL 6042244 (Ariz. Super. Ct. Nov. 27, 2017). Those factors are: (1) the defendant's solvency; (2) whether the defendant engaged in fraud; (3) the danger of the property being lost, concealed, injured, diminished in value, wasted, or squandered without a receiver; (4) the adequacy of available remedies; (5) the harm that would be caused without a receiver; (6) the plaintiff's likelihood of success in the lawsuit; and (7) whether the receivership would protect the interest of the party seeking the receivership. *Id.* at *3.

¶21 This court is not bound by *Patel*, and we decline to require trial courts to follow it. Nor do we view *Patel*'s seven factors as the only potentially relevant factors. But they are broadly consistent with the case law we have described above, to the extent still applicable under Section

12-1241. We agree that courts might find the factors helpful in guiding their equitable discretion, especially before imposing the "drastic remedy" of a receivership. *Johnson Utils.*, 249 Ariz. 215, ¶ 111 (Bolick, J., concurring in part and dissenting in part). We discern no error in the trial court's decision to rely on *Patel*. But in our review, we instead focus on whether the evidence supports the court's exercise of its equitable discretion under the statutory standard.

### III. Evidence considered in trial court's decision to appoint receiver

¶22 The trial court found ACPI's financial state "debatable" and that the weight of the evidence indicated "significant peril." The court also found a "significant risk" that Arnold had committed fraud and could not "be trusted" to protect "ACPI's remaining assets or whatever is left of" NBD's interest. Its conclusion was driven in part by large discrepancies in loan balances owed by ACPI to Arnold. In 2022, ACPI's year-end balance sheet reflected a roughly $83-million loan balance owed to Arnold's entities. Its balance sheet from 2023, however, reflected a year-end balance of $54 million. Soon after, promissory notes executed in 2024 showed balances of $65 million. During the litigation, also in 2024, Arnold filed a declaration asserting ACPI owed his entities $62 million.

¶23 None of these balances was accurate. An auditor testified that an audit of ACPI's 2023 financial position revealed that $18 million of claimed debt "should not be on the books." That debt instead appeared to be based on ACPI's acquisition of a right to use a license. Ultimately, the audit showed that Arnold was owed only about $40 million—tens of millions of dollars less than reflected on the balance sheets or his declaration.

¶24 Aside from the shifting balances, Arnold's conduct surrounding the loans raised significant questions. ACPI did not document all the loans from Arnold's entities, which were large. The auditor could not precisely identify the consideration Arnold provided, though Arnold's loans appeared to be substantiated with "reinvested equity fees and distributions." NBD's expert witness, a certified fraud examiner, also noted that Arnold had recharacterized reinvestments of equity distributions as debt. In addition, ACPI purportedly paid off notes but did not provide supporting documentation during the litigation. And NBD's expert testified that Arnold had recorded an increase of $15.6 million in ACPI's goodwill, then offset it with an identical amount of debt.

¶25         Moreover, the audit required $127 million in adjusting journal entries due to nontrivial misstatements in ACPI's books "as maintained by current management." The auditor similarly testified that he was unable to identify millions of dollars in credit-card reimbursements that ACPI reported as owed to Arnold's entities. NBD's expert testified that the shifting loan balances and financial discrepancies indicate potential fraud.

¶26         The trial court also relied on evidence that ACPI had suffered significant financial losses. The audit report showed a net loss for 2023 in excess of $9 million. It also showed, though, that ACPI generated $11.4 million in earnings before interest, taxes, depreciation, and amortization.

¶27         The trial court further noted Arnold's deceptive conduct toward investors. As for NBD, Arnold caused it to pay $6 million to ACPI from 2018 to 2022, as well as $19 million to Arnold's entities. This $25-million total was largely management funds and access fees. But Lewan, NBD's majority member, had believed it was only $6.5 million. And of that, he believed $6 million was a loan convertible to equity. In addition, Arnold unilaterally transferred part of NBD's original investment in ACPI to one of his wholly owned entities.

¶28         Also, Arnold sought to restrict NBD's ability to copy ACPI's records and learn the identity of other investors. He did so close in time to when NBD sought to sell its interest in ACPI. Indeed, ACPI's principal investor, a separate entity, did not learn of the proceedings until two weeks before the evidentiary hearing. And until the second day of the evidentiary hearing, ACPI did not disclose to NBD its plan to liquidate $80 million in real estate soon after the hearing.

## IV. The trial court acted within its equitable discretion

¶29         Based on this evidence, the trial court found, "[I]t requires little imagination to see the significant risk that Mr. Arnold built ACPI largely with Mr. Lewan's and other investors' money. Once Mr. Lewan began asking questions, Mr. Arnold arranged to have his (overstated) loans paid first if ACPI goes bust." The evidence supports this finding. Absent a receiver, Arnold could have continued to dissipate ACPI's assets, including by repaying his own overstated loans while leaving NBD and other investors with limited recourse. We have identified no equitable principle that precludes appointing a receiver under these circumstances. *See Gravel Res. of Ariz.*, 217 Ariz. 33, ¶¶ 12-14 (affirming appointment where court found it was "best method of protecting" assets). Likewise, these

circumstances satisfy Section 12-1241, given the need to "protect and preserve" ACPI and its property against Arnold's conduct.

**¶30**        This is true even though, as Arnold asserts, damages could theoretically supply a remedy.   The trial court acknowledged this possibility, noting that "Mr. Lewan can be made whole in many respects by damages."  It was appropriate for the court to weigh this possibility against other factors.  But as we have discussed, the receivership statute no longer requires irreparable injury, so the availability of damages is not dispositive. *See* 1993 Ariz. Sess. Laws, ch. 43, § 1; *Gravel Res. of Ariz.*, 217 Ariz. 33, ¶¶ 10-11; *IB Prop. Holdings, LLC v. Rancho Del Mar Apartments Ltd. P'ship*, 228 Ariz. 61, ¶ 10 (App. 2011) (injury may be irreparable where damages are insufficient remedy).

**¶31**        Further, although Arnold characterizes the underlying issues as primarily involving "interpersonal claims as between Lewan and Arnold," those claims turn largely on Arnold's alleged dissipation of ACPI's assets.  Absent preservation of those assets, it is not clear that Arnold could ultimately pay a damages award, especially of the magnitude that NBD is seeking.  Indeed, the trial court concluded that Arnold "cannot be trusted to safeguard ACPI's remaining assets or whatever is left of Mr. Lewan's investment."   Given the court's findings about Arnold's conduct, the record supports this conclusion.

**¶32**        We acknowledge that Arnold offered contrary explanations for ACPI's loan-balance discrepancies, financial losses, restriction of access to records, and other evidence indicating potential fraud.  But the trial court found his explanations not "credible or worthy of significant weight."  We defer to that finding.  *See Swain*, 247 Ariz. 405, ¶ 32.  Likewise, much of Arnold's argument asks us to reweigh conflicting evidence or direct the court to exercise its discretion differently.  We will not do so.  *See id.*  We instead conclude that the court did not abuse its equitable discretion in appointing a receiver.

**ATTORNEY FEES**

**¶33**        NBD, which is the prevailing party on appeal, requests its attorney fees.  It does so under A.R.S. § 12-341.01, which permits a court to award fees arising out of contract, and A.R.S. § 12-1840, which permits a court to award costs if "equitable and just" in declaratory-judgment actions. But it characterizes its request for fees as arising out of the underlying claims in the litigation, which have not yet been adjudicated.  We therefore decline to award attorney fees.  Our decision is without prejudice to the trial

court considering appellate fees after the litigation concludes. But because NBD is the prevailing party on appeal, it is entitled to recover its reasonable costs on appeal under A.R.S. § 12-342(B).

## DISPOSITION

¶**34** We affirm the trial court's appointment of a receiver.